**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

FRANK J. RIVERA,

        Plaintiff,

v.                                      No. CIV 02-571 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff  Frank J. Rivera ("Rivera") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Rivera was not eligible for disability insurance benefits ("DIB") or supplemental security income benefits ("SSI").  Rivera moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.  [Doc. 12.]

**Background**

Rivera was born on August 27, 1952 [tr. at 83] and was 48 years old when the administrative hearing was held.  He is divorced and stays with Helen, who he described as a female friend of the family, although other records indicate Helen was Rivera's "significant other."   Rivera has four children over the age of 18.  [Tr. at 32.]  He was in the military from 1969 to 1972 and served in Vietnam for 16 months.  [Tr. at 38, 55.]  He was not in actual combat but worked as a radio operator in combat areas.  [Tr. at 55.]   Rivera attended school through the ninth grade and has a high school

1

graduate equivalency degree (G.E.D.), is bilingual and has vocational training in radio and television repair.  [Tr. at 36-37, 114.]  His past relevant work experience includes handyman, tire repairer, salesperson, carpenter, woodworker and laborer.  [Tr. at 89.]  In the 1970's he was able to hold down jobs pretty well, but claims he had more difficulties in the 1980's because of his anger and inability to deal with the public.  [Tr. at 56.]  From August through December 2000 (subsequent to his application for social security benefits), he worked as a lumber salesman at Loews Home Improvement Center.  [Tr. at 38.]  After quitting that position, he applied for different jobs but was unsuccessful.  [Tr. at 39.]  Rivera testified at the hearing that he continues to work about 20 hours per week as a self-employed carpenter, earning approximately $200 per week.  [Tr. at 32-33.]

On September 21, 1999, Rivera applied for SSI benefits, and on December 6, 1999, he submitted an application for DIB, claiming an onset date of August 19, 1999, due to post traumatic stress disorder ("PTSD"), hypertension, alcoholism, and dizziness.  [Tr. at 12, 83, 108, 254.]

Administrative Law Judge William F. Nail, Jr. held an administrative hearing on May 17, 2001, at which Rivera was represented by counsel.  [Tr. at 28.]  In a decision, dated August 22, 2001, Judge Nail found that Rivera was not eligible for benefits.  [Tr. at 12-17.]  Judge Nail specifically determined that Rivera had the residual functional capacity ("RFC") to perform light work, that his prior relevant work as a woodworker was not precluded by his RFC, and alternatively, that an application of the grids directed a finding of "not disabled."  [Tr. at 16-17.]  On April 13, 2002, the Appeals Council denied Rivera's request for review.  [Tr. at i, 5-7.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, he is capable of performing other work.[8]

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[9]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (relying on Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Non-exertional limitations can include mental impairments. The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.)

In this case, the ALJ's first finding of non-disability was at step four based on Judge Nail's determination that Rivera had the RFC to perform his past relevant work as a woodworker and salesperson. Alternatively, or in addition, Judge Nail concluded at step five, through the application of the grids, that Rivera retained the capacity to perform work at a light exertional level. [Tr. at 16.]

---

national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

**Standard of Review and Allegations of Error**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing the medical records, the ALJ concluded that Rivera was not disabled under the standards of the Social Security Act. In reaching this decision, Judge Nail made the following findings: (1) Rivera did not engage in substantial gainful activity since the alleged onset of disability;

(2) Rivera had a combination of impairments that were considered "severe" (including hypertension, diabetes mellitus, PTSD, high blood pressure, and history of alcoholism; (3) these impairments were not severe enough to meet or equal a Listing; (4) Rivera's allegations of his limitations were not totally credible; (5) Rivera retained a RFC to perform "light" work; (6) he was able to perform his past relevant work, and his medically determinable impairments did not prevent him from performing his past relevant work; (7) an application of the grids directed a finding of "not disabled"; and (8) he was not under a disability, as defined by the Social Security Act, at any time through the date of the ALJ's decision.  (Tr. at 12-17.)

In this appeal, Rivera generally argues that reversal and remand are required because the ALJ's decision was not supported by substantial evidence and the Commissioner failed to carry her burden of proof or apply correct legal standards to the case.  [Doc. 13.]  More specifically, Rivera asserts that the ALJ's past relevant work findings were contrary to law, that the PTSD findings were unsupported and erroneous, that the ALJ's finding that Rivera's high blood pressure was remediable was unsupported, and that the ALJ's credibility determinations were unsupported.  [Doc. 13.]  The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations.  [Doc. 15.]

After a review of the entire record, this Court finds that this matter should be remanded for reasons explained below.

6

## Summary of Rivera's Work History, Medical Conditions and Treatment

In September 1999, Rivera applied for social security benefits.  One month before his application, an August 10, 1999 medical record indicates that Rivera inquired at the Veterans Administration Medical Center ("VAMC" or "VA") about admission for treatment of recurrent alcoholism.  He reported that he was sober for about 9 years but had relapsed in 1995 and began drinking progressively on a daily basis since then.  He was drinking about 2 liters of beer daily and an occasional pint of vodka.  He denied all other drug use including prescription drugs, methamphetamines or marijuana. [Tr. at 207.]  He recently had ended a long-term relationship but was in a new relationship and did not want to jeopardize it by drinking. He was placed on a waiting list at the VAMC.  [Tr. at 207.]

On August 20, 1999, Rivera was admitted to an inpatient program at the VA.  [Tr. at 206.] He reported that he was self employed then as a wood worker.  Contrary to the earlier August 10 medical record, he admitted remote cocaine and speed use.  [Tr. at 206, 207.]  His last use of alcohol was three weeks ago.  He had a history of hypertension but had not taken any medications for it for several years.  He was to restart Atenolol, a hypertension medicine.  [Tr. at 206.]

On August 23, 1999, Rivera was given a mental health assessment at the VA.  [Tr. at 202.] The notes show that he had started drinking again in 1995 after a dispute at work. Rivera reported that some of the consequences of his drinking included blackouts, lost relationships, unsteady employment, "DT's, DUI x2." [Tr. at 202.]  He had started drinking and using marijuana at age 16. He smoked marijuana "mostly daily use over past 31 years, around 2 cigarettes a day.  Last use 10 days ago.  Methamphetamines (crank) for 7 years (1985-1992)." [Tr. at 203.]  Again, Rivera's latest history of drug use is inconsistent with the first VA record.

7

Rivera also reported severe physical and emotional abuse by his step-father.  He had two years of community college and a certificate in electronics.  He had been an above average student.  He noted that he had seen some death in Vietnam and that his best friend died in his arms after being shot in the head.  [Tr. at 204.]  He reported that his recreational and leisure activities were: "woodworking, sexual relationships, dancing, listening to music." [Tr. at 204.]  His diagnoses at this time were alcohol and cannabis dependence.

Also on August 23, Rivera complained that he was light headed and dizzy since starting the Atenolol.  However, upon further questioning, he admitted that the dizziness started before the medication and that he thought it was due to drinking.  [Tr. at 201-02.]  Nonetheless his hypertension medication was changed to Felopidine.

On August 24, Rivera was still dizzy and had a slow heart rate.  He attended and was actively involved in several types of group treatment sessions at the VA.  He had good eye contact, bright affect, took notes, and asked questions.  [Tr. at 199.]  On August 25, Rivera again attended and participated in group sessions.  The first medical record noting possible PTSD states that Rivera would be assessed to determine "readiness to address possible PTSD." [Tr. at 199.]  On August 25, Helen, Rivera's significant other, attended his group session and made it clear that she would not accept Rivera's use of alcohol.

On August 27, Rivera's blood pressure was still elevated, and the medication was increased. [Tr. at 193.]  His learning needs were assessed on this date.  He demonstrated a willingness to learn, and seemed to have no barriers to learning.  [Tr. at 194.]  Rivera was to be referred for a PTSD evaluation, but it would be months before it could be scheduled.  [Tr. at 195.]  An August 27 note indicates that Rivera was employable and had resources.  [Tr. at 195.]  He believed that he started

increasing his drinking when he spoke of his Vietnam experience to Helen and that he wanted to drink to forget the experience.  [Tr. at 196.]  On this same date, Rivera discussed problems with his anger.  [Tr. at 197.]

On August 30, Rivera was actively participating in group sessions at the VA and discussing anger.  He was not feeling dizzy on this date and exhibited a brighter affect.  [Tr. at 190-93.]  The early September VA notes similarly show that Rivera was participating.  [Tr. at 185-189.]  One note indicates that he is a talented "santero."  [Tr. at 187.]

On September 10, 1999, Rivera again complained of dizziness.  His blood pressure was still high as well.  His medications were changed to Lisinopril, and he was taking Antabuse.  [Tr. at 182, 184.]  On September 13, he reported feeling no dizziness on the new medication and that he felt better.  [Tr. at 181-82.]  He discussed his feelings of rage about his step father's abuse.  [Tr. at 181.]

On September 16, Rivera started working in a psycho social treatment group with William Ware, an addictions therapist.  [Tr. at 178.]  He was discharged on September 17, after participating in the VA inpatient program for 28 days.  He was to continue weekly therapy with Mr. Ware and to participate in AA.  [Tr. at 176.]  He agreed to have the PTSD evaluation within the next 6 months as he had never been treated or evaluated for it previously.  [Tr. at 176.]  The medical note indicates that he exhibited signs and symptoms of PTSD that impacted his alcohol dependence.  Rivera's high blood pressure was stabilized at the time of discharge.  [Tr. at 176.]  He was given a guarded prognosis for recovery and a regular discharge.  The prognosis would improve if he followed treatment.  [Tr. at 177.]

Rivera's significant other, Helen, attended a group on September 16 and expressed concern regarding Rivera's ability to maintain sobriety and with her possible "enabling" behavior of providing

him a place to live.   [Tr. at 177.]   At discharge, Rivera was taking Felopidine and Hydrochlorothiazide.  [Tr. at 175.]  His GAF was 50.  [Tr. at 173.]

On October 1, 1999, Rivera was seen at a medical clinic for dizziness.  He reported no drinking since completing his VA treatment program.  [Tr. at 168.]  He had stopped taking the Hydrochlorothiazide because he felt it increased his dizziness.  He was back on Lisinopril which was increased as of this date.  He was smoking 6 nicotine cigarettes a day.  The etiology of Rivera's dizziness was unclear.  [Tr. at 170.]  The physician was going to consider a head CT if the symptoms did not resolve.  [Tr. at 170.]

On October 7 and 21, Rivera participated appropriately in the therapy group facilitated by Mr. Ware.  [Tr. at 167.]  On October 14, he was a no show.  [Tr. at 165.]  His medications as of October 20 were Lisinopril and Disulfiram.  Rivera continued to show up for his group sessions in October and November.  [Tr. at164.]  After many years of no contact with his family, Rivera spent time with his family over Thanksgiving which went very well.  [Tr. at 160.]

On November 11, 1999, Rivera filled out a social security Daily Activity Questionnaire.  [Tr. at 101.]  He reported that his typical day consisted of getting up at 4 a.m., walking around, watching TV, going to an AA meeting, taking care of his appointments, trying to take a nap, and trying to do his hobby.  Sometimes he ate and sometimes not.  He alleged he was unable to concentrate, that his medication made him very dizzy and that his heart always beat fast.  He had not seen his relatives in 14 years and did not trust anyone.  [Tr. at 101-02.]  He stated that people make him angry and no one could tell him what to do.  He frequently had been fired and did not want to be around people.  [Tr. at 103.]  Rivera also filled out a dizziness questionnaire near this same time.  He said he had lightheadedness and blacking out or loss of consciousness but no falls.  The dizziness was not

10

constant but occurred in attacks.  It started many years ago, but he had one to two attacks a day.  [Tr. at 117.]

At a December 10, 1999 medical appointment, Rivera reported that his dizziness was resolved.  The record shows that his hypertension was "well controlled" but he had developed a cough.  He complained of depression and was started on Nortriptyline.  He was still alcohol free.  He was planning to stop smoking.  [Tr. at 157-58.]  He was still taking Lisinoprol and Disulfiram.  [Tr. at 156.]  Rivera continued to attend his therapy groups in December and planned another family visit over the holidays.  [Tr. at 155-56.]

On January 5, 2000, a psychiatric review technique form was filled out by psychologist Helen Patterson.  [Tr. at 214.]  She noted that Rivera's impairments were not severe.  She found anxiety related and substance addiction disorders.  Patterson also observed that his treatment notes at the VA did not reveal any symptoms of PTSD even though that diagnosis was suggested to Rivera by the VA.  "Evidence does not appear to strongly support this diagnosis, with primary problem being alcoholism, presently in remission."  [Tr. at 215.]

On January 5, 2000, Rivera attended and interacted well with the group.  He was still on the Antabuse.  [Tr. at 154.]  His medications as of this date were Thiamine, Folic Acid, Nortriptyline, Disulfiram, and Irbesartan.  The record shows that because of his cough in December, he was taken off of Lisinopril and started on Irbesartan.  His heart rate increased while taking Nortriptyline and that medication was stopped.  On January 7, he asked for another antidepressant for chronic depression and was given a trial of Paxil.  [Tr. at 153-54.]  He continued to attend therapy in January and participate with the group well.  [Tr. at 151.]

On January 25, the medical record indicates that his hypertension was not adequately controlled with Irbesartan, and it was increased. He was having some tachycardia that might be due to anxiety/PTSD. The Paxil could be contributing to the tachycardia. [Tr. at 151.]

On February 10, 2000, Rivera complained of dizziness for the first hour after waking in the morning. He also experienced some dizziness throughout the day. [Tr. at 147.] It appears that he was exercising at this time, including water aerobics, jazzercise and salsa dancing. His blood pressure remained elevated despite his sobriety and intensive exercise. Rivera continued to acknowledge he needed to stop smoking. The physician wished to take a fairly aggressive approach to the blood pressure problem due to his younger age. His medications then were: Irbesartan, Folic acid, Thiamine, Paroxetine, Triamterene, and Disulfiram (noting that he took this medicine only when he had an urge to drink). [Tr. at 147.] Rivera participated appropriately and actively in his group therapy sessions through January and February. He was assigned a GAF of 55 in February. [Tr. at 140.]

On February 25, 2000, Rivera's underlying application for social security benefits was denied. [Tr. at 66.]

In March 2000, Rivera was a no show for a group therapy session and a doctor's appointment. [Tr. at 144.] On March 30, he attended group therapy. On April 6, 2000, he was a no show for his medical appointment. [Tr. at 143.] On April 14, he appeared for his medical appointment but the care provider was running late, and he had to wait about 20 minutes. At that point, he went to see a patient advocate because he was angry about the delay. He left without being seen by the provider. [Tr. at 142.] On that same day, he also had an optometry appointment. He wanted new glasses and became "VERY" upset when he was informed that refractive services were

not covered.  He was so angry that he refused to undergo the exam and left the clinic.  [Tr. at 140.]

Rivera attended group therapy on April 27, 2000 and interacted with group members appropriately.  [Tr. at 140.]  Rivera continued group therapy through May 2000.  On May 17, he spoke with a medical provider and complained of dizziness and depression.  [Tr. at 138.]  He was seen on May 23rd for dizziness.  He reported that his dizziness was chronic and present since childhood but that it was worse in the last few months.  His hypertension was not adequately controlled.  [Tr. at 137.]

On May 21, 2000, Rivera requested reconsideration of the denial of his underlying application for benefits.  On the form he alleged that he was unable to work due to constant fear, unable to concentrate, and unable to be around people. He was having thoughts of suicide.  [Tr. at 70.]

On May 24, 2000, there is a record of a phone call to the VAMC from Rivera's "sister," Helen.  She stated that her brother was denied medicare and medicaid and that the department was requesting a letter from his physician stating that because of his treatment/depression he was unable to work.  The caller stated that she really needed to get him assistance  so that he could "get on his own."  [Tr. at 135.]  The caller was told to contact Mr. Ware, the therapist because Rivera had been a no show with his doctor.  The caller was upset.  [Tr. at 136.]  Rivera had an appointment scheduled for July, and the caller was told that he could bring the forms then.  Rivera attended his group therapy on May 24th, apparently without discussion of Helen's call that day.  [Tr. at 135.]  Rivera did not attend the May 31 group therapy session.  [Tr. at 134.]

Rivera was seen on June 2nd by a medical care provider.  The note reflects that Rivera suffered from long term depression that had worsened since he was denied food stamps and social

security.  He wanted to be evaluated for disability.  [Tr. at 134.]  His diagnosis on this date was early

diabetes mellitus.    Rivera was a no show to group therapy on June 7.  [Tr. at 132.]

On June 26, 2000, the earlier denial of disability was affirmed.  [Tr. at 65.]  On July 18, 2000,

Rivera filled out a statement in support of his request for a disability hearing.  He reported problems

with dizziness, eyesight and hearing, high blood pressure, high cholesterol, borderline diabetes,

PTSD, depression, forgetfulness, concentration, nightmares and insomnia.  [Tr. at 126.]  He was

taking several medications, including Simvastatin (cholesterol, diabetes), Paxil, Disulfiram, Folic Acid,

Hydrochlorothoriazide (HBP), Thiomine, Ibuprofen, Irbesartan (HBP), and Antabuse.  [Tr. at 127,

129.]

On July 7, 2000, Rivera saw a physician for complaints of dizziness.  The medical record

indicates that the dizziness was "of unknown etiology."  [Tr. at 240.]  Medical records also show that

Rivera was a no show on November 1, 2000 for his nutrition consultation visit.  [Tr. at 253.]

On January 21, 2001, it appears that Rivera received a mental health assessment consult with

the VA.  [Tr. at 249.]  He was complaining of problems he had had since Vietnam, including anxiety,

nightmares, avoidance of stimuli related to trauma, depressed mood, suicidal ideation, social isolation,

difficulty having warm feelings towards others.  The record notes that following his group therapy

sessions at the VA, he experienced re-emergence of intrusive symptoms and ceased his participation

in the program.  He had been off his hypertension and other medications for one month but was

seeking prescriptions.  [Tr. at 250.]  Rivera reported that he had been abstinent from alcohol from

1986 until 1996 when he relapsed but had "shaky sobriety since that time."  [Tr. at 250.]  On January

21, he said he had been abstinent from alcohol and marijuana for 10 days.  In the past three months,

he was drinking 1-2 quarts of beer daily and 1 joint of marijuana daily.  [Tr. at 250.]  Rivera also

14

reported that he had a good relationship with his girlfriend for 1.5 years although there was some stress related to his PTSD and use of alcohol.  [Tr. at 251.]

The record also indicates that Rivera had trouble getting along with others at work.  He had pending charges against him for driving without a license.  [Tr. at 251.]  The assessment shown on this record was that he met the criteria for a diagnosis of PTSD and secondary depression.  [Tr. at 251.]  His current GAF was 41.  [Tr. at 252.]

Rivera was to attend PTSD group therapy, but was a no show on January 25, 2001 and February 1, 2001.  [Tr. at 248.]  He also did not report for an orientation appointment.  [Tr. at 247.] On February 7, 2001, Rivera received a letter from the PTSD Trauma Clinic at the VA scheduling a one-session "orientation to PTSD" meeting for March 1st.  [Tr. at 228.]  Rivera attended the PTSD group on March 1, 2001 and was attentive.  [Tr. at 247.]

On March 7, 2001, Rivera called the medical clinic to report his blood pressure had been especially high for two weeks.  An appointment was scheduled for March 13th.  [Tr. at 246-47.]  At the March 13th appointment, Rivera's medications were discussed.  The record notes uncontrolled hypertension, that his blood pressure had increased in the last 2-3 weeks.  [Tr. at 244.]  Rivera denied any illicit use of drugs on that date and any use of alcohol for the last four months.  [Tr. at 245.]  This March 13 record also reflects that Rivera had demonstrated non-compliance with follow up medical appointments and that the medical care provider wondered if he had been non-compliant with his medications, even though he denied non-compliance.  [Tr. at 245.]  The provider wished to rule out any underlying acute process before reaching any conclusions.  The provider left Rivera on the same medications and encouraged him to take them as directed.  [Tr. at 245.]

In an addendum to the March 13 record, the care provider notes that she gave Rivera the results of his lab work which were normal and that they planned to have him continue with his current medications and follow up with the pharmacy department in a few days.  Rivera expressed anger with this information and left abruptly even though the provider told him he needed another agent added to his regiment.  [Tr. at 246.]  Rivera's alcohol screening on this date was positive.  [Tr. at 246.]

On March 28, Rivera requested a change in his primary care physician and was reassigned to a different provider.  His next appointment was for April 10.  [Tr. at 244.]  On April 10th, Rivera did not show up for his appointment.  [Tr. at 243.]  On April 20, he missed his Staying Sober with PTSD Group.  [Tr. at 243.]  On April 26, Rivera did attend the PTSD group and stated that his information indicated that the start date for the group was April 26.  [Tr. at 243.]  The record notes that Rivera smelled of alcohol in the group.  [Tr. at 243.]

On May 3, 2001, Rivera attended the PTSD therapy session.  He did not appear to have been drinking and was quiet and attentive during the session.  [Tr. at 242.]

At the administrative hearing on May 17, 2001, Rivera testified that he did not have a steady job then but that he performed odd jobs, including construction and finishing carpentry work.  [Tr. at 32-33.]  Rivera was able to do his own measurements and cutting of lumber, along with the finishing work.  He used a regular hand saw and a plane and sanders.  [Tr. at 34.]  He was currently building a mantel for a fireplace and doing some electrical lighting fixtures.  [Id.]  Sometimes he dedicated up to five hours a day on that work, and perhaps as much as 20 hours per week.  Rivera testified that it all depended on something but that portion of the transcript is inaudible.  [Tr. at 33.]  He was paid $10 an hour and on average $200 per week.

16

Rivera testified that his main problems were PTSD, anxiety, high blood pressure and that he was "very dizzy" right then but that the dizziness as normal for him.  [Tr. at 41.]  He also said that he had depression and insomnia.  He was in the early stages of diabetes but was not taking insulin. and was watching his diet. [Tr. at 41-42.]  He was exercising and taking cholesterol medication.  [Tr. at 42.]  Rivera explained that his high blood pressure was not being controlled by medication at that time although it seemed to have helped at first.  [Tr. at 43.]

Rivera also testified that a friend drove him to the hearing because his driver's license expired 20 years ago, and he never renewed it because he did not feel very comfortable in public.  [Tr. at 44-45.]  Rivera was attending a support group for drinking and the PTSD clinic.  [Tr. at 45.]  He occasionally went out to movie or to a restaurant.  [Tr. at 47.]  He found his woodworking relaxing and was able to concentrate on it.  [Id.]  He sometimes participated in woodworking shows but he was not always able to attend because he felt he could not be out in public.  [Tr. at 48.]

Rivera reported that he could do yard work, take care of the dogs, perform odd jobs around the house, cook his meals and vacuum.  He did his own laundry and ironing.  [Tr. at 49.]  He shopped for groceries.  He cared for his personal needs, including bathing and dressing himself.  He walked to his sobriety meeting which was about a half a mile from his house, and was able to walk for about two miles or more.  [Tr. at 50, 52.]  He could kneel down at church for a few minutes.  [Tr. at 52.]  He could squat and go up and down stairs.  [Tr. at 53.]  He could easily lift 40 pounds.  [Tr. at 52.]  Rivera was able to sit for two to three hours and stand for the same amount of time.  [Tr. at 52.]

Rivera testified that he smoked about two packs of cigarettes per week and drank about three quarts of beer in a month.  [Tr. at 53.]  He explained that his drinking had been a problem at one point, and that he began drinking about one month before getting out of the military.  His drinking

17

related to an incident in Vietnam that gave him nightmares.  The only way he could stop the nightmares was to pass out.  [Tr. at 54.]  He told the ALJ that he was not drinking prior to going into the military.  [Tr. at 53.]

At Rivera's most recent job with Loews, he walked off the job after getting into a "hassle" with a manager.  [Tr. at 57.]  Rivera went to the VA for treatment for his PTSD about one month before the administrative hearing was held, although he testified that he applied for treatment several years before the hearing.  [Tr. at 58.]  According to Rivera, it took several years before one could actually get an appointment for treatment at the VA.  [Tr. at 58.]

Rivera described his PTSD as consisting of depression, nightmares, drinking to numb the pain, and having "demons in his head."  [Tr. at 59.]  Rivera first went into treatment for his alcohol problems in 1986, and he said the treatment worked for 10 years.  [Tr. at 59.]  He relapsed after seeing his children whom he had not been able to see for a certain period.  [Tr. at 60.]  His relapse lasted two years until he returned to the treatment center.  [Tr. at 60.]  Rivera testified that he had not had anything to drink since the "course" started, meaning the PTSD group therapy.  [Tr. at 60.]  He explained that the group participants were not allowed to drink and were given a drug test to ensure that participants were sober.  [Tr. at 60.]   However, as stated above, Rivera apparently had been drinking before at least one of the PTSD group therapy sessions.

**Discussion**

**I.      STEP 4 -- PAST RELEVANT WORK**

The Tenth Circuit explained in Winfrey v. Chater that there are three phases of evaluation the ALJ must complete within step 4 of the sequential process.  Winfrey, 92 F.3d 1017, 1023 (10th Cir. 1996).

18

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

Id. (internal citations omitted).

Here, the ALJ concluded that Rivera retained the RFC for a light range of work and that based on this RFC, he was not precluded from performing his past relevant work as a woodworker and salesperson. [Tr. at 15-16.] Rivera asserts that this finding was contrary to law and/or unsupported by substantial evidence because Judge Nail did not obtain adequate factual information about the work demands of Rivera's past relevant work to reach his determination and did not comply with the requirements set out in Winfrey.

In his decision, Judge Nail set forth the definition of RFC, noting that he was required to examine the effects of physical and mental limitations that might affect the claimant's work-related abilities. He also stated that in making the assessment, he must consider all the symptoms, including pain.[10]

Judge Nail then discussed Rivera's testimony at the hearing regarding any limitations he had both physically and with respect to his diagnosis of PTSD. [Tr. at 14.] The ALJ carefully and fully considered the evidence and records that supported his very appropriate finding that Rivera did not have significant physical restrictions. Indeed, there is no objective medical evidence in the record to support the conclusion that Rivera was physically unable to do light work. Even if Rivera's

---

[10]Here, symptoms of pain were not an issue. Indeed, portions of the opinion appear to consist of boilerplate definitions that are not linked to Rivera's actual symptoms.

19

complaints of dizziness, which may or may not be associated with high blood pressure, are found credible, the record still does not demonstrate that the dizziness precluded him from performing light level work.

Judge Nail next addressed the evidence regarding Rivera's PTSD symptoms and/or diagnosis, but his analysis at this point is just as comprehensive as before. He states, for example, that "Rivera's attendance in a support group is apparently useful as noted in performance of activities of daily activities and duties as a woodworker. It is reported that the claimant is 'doing very well' with sessions. Therefore, I find that the mental limitations associated with PTSD have imposed no functional limitations . . . ." [Tr. at 15.] Judge Nail provides no further discussion of the PTSD, or the fact that the most recent VA medical records indicate that Rivera was not attending his PTSD groups regularly and had actually shown up at one session smelling of alcohol and testing positive for alcohol. Nor does Judge Nail cite any objective medical evidence in relation to his findings that Rivera was "doing very well." The ALJ also fails to discuss Rivera's most recent GAF[11] of 41 [tr. at 252]. A GAF rating of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV- TR, 34.

While the Court may be inclined to agree with Judge Nail's conclusion that the symptoms of PTSD did not cause Rivera to have functional limitations, the ALJ failed to provide the required specific factual findings and did not link his findings to the objective medical evidence. Thus, this

---

[11]The Global Assessment of Functioning, or GAF, scale is used by clinicians to report an individual's overall level of functioning. See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed.1994).

Court cannot make a determination as to whether substantial evidence supports Judge Nail's ultimate finding under step 4.

The phase two findings similarly cause concern. These findings relate to the physical and mental requirements of Rivera's past relevant work. In assessing the requirements of a claimant's past relevant work, the ALJ might consider the Disability Report filled out by claimant that contains descriptions of those work demands, the claimant's testimony about his or her prior work, and/or information provided by a VE.[12]

Here, the ALJ's opinion only briefly defines "past relevant work" as it is set out in the pertinent social security regulations and then provides the conclusion that "the evidence . . . establishes that the claimant has past relevant work as a woodworker and salesperson." [Tr. at 16.] There are no specific factual findings as to the demands of Rivera's previous relevant work, either as a woodworker or a salesperson. For example, the ALJ does not refer to any testimony by Rivera about the work demands or requirements of these positions. In fact, during the administrative hearing, very little was discussed in terms of the work requirements of those jobs. The ALJ does not refer to the Work History Report or the Disability Report filled out by Rivera, [tr. at 89, 107], and no VE was called to testify at the hearing.

---

[12]As stated above, the claimant bears the burden of proof at step 4 of the sequential evaluation process to demonstrate that he cannot perform his past relevant work. However, the Tenth Circuit has clarified that notwithstanding the plaintiff's burden, the ALJ has a duty of inquiry and factual development and that the ALJ must make specific findings at phases two and three of the step four inquiry. Winfrey, 92 F.3d at 1024. Here, the Court notes that Rivera's work history and disability reports contain little, if any information, concerning the requirements of his past relevant work. Even so, the ALJ still had a duty of inquiry and could have obtained the required information during the administrative hearing from Rivera. See Henrie v. U.S. Dep't of HHS, 13 F.3d 359, 361 (10th Cir. 1993) (while burden of proving disability remains with the claimant at step 4, the ALJ has a duty of "inquiry and factual development.")

In <u>Jason v. Chater</u>, the Tenth Circuit emphasized that the ALJ "must develop an adequate factual record regarding the pertinent physical and mental demands of the claimant's past relevant work. <u>Jason</u>, 54 F.3d 787 (Table, Text in Westlaw), 1995 WL 275725 at *2 (10th Cir. May 10, 1995).

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

<u>Id.</u> (internal citation omitted). "In order to make the ultimate finding that a claimant is not disabled at step four, the ALJ is required by the agency's own rulings to make specific and detailed predicate findings concerning . . . the mental demands of the claimant's past jobs, and how these demands mesh with the claimant's particular exertional and nonexertional limitations." <u>Delaney v. Apfel</u>, 182 F.3d 931 (Table, Text in Westlaw), 1999 WL 373274 at *1 (10th Cir. June 9, 1999) (internal citations omitted).

Without factual findings regarding the demands of Rivera's past relevant work, this Court cannot accurately determine whether substantial evidence establishes he can satisfy the requirements of his prior jobs in view of his RFC. On remand, the ALJ should also make more specific findings with respect to the diagnosis of PTSD and mental requirements of the prior relevant work, particularly here where Rivera alleges that he cannot be around people and left his most recent prior job because of problems with personnel. *See* <u>Flores v. Apfel</u>, 242 F.3d 388 at *3 (10th Cir. Nov. 13, 2000) ("Where . . . the claimant suffers from a severe mental impairment that does not meet the listings, the consideration of the mental RFC must include an assessment of the ability 'to interact appropriately with the public, supervisors, and co-workers.") (internal citation omitted). Accordingly,

while there may well be relevant evidence supporting the ALJ's ultimate conclusion of non-disability, the ALJ did not discuss that evidence or make the required factual findings as he must in accordance with Tenth Circuit law.[13]  **II.   STEP 5 - APPLICATION OF THE GRIDS**

While concluding that Rivera could return to his past relevant work, Judge Nail proceeded to step 5 and determined that an application of the grids also supported a finding of non-disability. The Court need not reach Plaintiff's argument that the step 5 findings were erroneous because of the Court's decision to remand for insufficient factual findings at step 4.  Indeed, application of the grids alone, at step 5, would be improper if the ALJ determines on remand that Rivera, because of PTSD, has nonexertional impairments that restrict his work-related abilities.

**III.   CREDIBILITY FINDINGS**

Rivera also challenges the ALJ's credibility findings.  Again, the Court does not need to reach this issue based on its decision to remand.  However, the Court observes that Judge Nail stated summarily that Rivera's allegations regarding his limitations were not totally credible "for the reasons set forth in the body of the decision."  [Tr. at 16.]  In examining the body of the decision, the ALJ said very little, if anything, about Rivera's credibility or, in any event, did not comment specifically why he found Rivera's testimony not credible.

However, the Court recognizes that the ALJ is optimally positioned to observe and assess witness credibility.  Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991).  Nonetheless,

---

[13]This case is distinguishable from Doyal v. Barnhart, __ F.3d __, 2003 WL 21350254 (10th Cir. June 10, 2003), where the Court found that the ALJ's findings were adequate to satisfy the step 4 Winfrey requirements.  In Doyal, the claimant similarly argued that the ALJ made no phase 2 findings with respect to demands of her prior relevant work experience.  However, in Doyal, unlike this case, a vocational expert testified regarding the demands of the claimant's past relevant work, and the ALJ relied on that information supplied by the VE.  Id. at *2.  The Court acknowledges that an ALJ cannot delegate the analysis at step 4 to a VE; however, the ALJ can rely on information supplied by a VE at this stage.  Id.

"findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002) (internal citation omitted).  The Court notes that the record supports the ALJ's conclusion on credibility.  For example, Rivera's testimony is replete with inconsistencies, including when Rivera started or continued to drink, what caused his drinking relapses, whether and how much  he used illicit drugs, whether he had difficulties socializing with people in view of his group therapy sessions and his hobby of dancing for example, whether he has trouble holding a job because of his drinking or because of his experiences in Vietnam, when his dizziness began, and whether his drinking or hypertension caused his dizziness.  In addition, the record presents serious questions about whether Rivera truly was compliant with is medications, including his blood pressure medicines.  However, even though the record supports Judge Nail's conclusions, the conclusions themselves must be based on record findings, and those findings are absent.

Accordingly, while the Court must remand due to insufficient factual findings by the ALJ, this remand should not be read to mean that the Court found Rivera's allegations credible.  Indeed, while not discussed much by the parties or the ALJ, the record presents grave concerns about Rivera's credibility, along with his use of alcohol and its possible effect on his alleged inability to work.  If, on remand, the ALJ does conclude that Rivera is disabled under the pertinent law and regulations, it will be for the ALJ to determine what role his alcohol use plays in any such disability.  "An individual shall not be considered to be disabled . . . if alcoholism or drug addition would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  See Adame v. Apfel, 4 Fed. Appx. 730, 732-33, 2001 WL 193820 at *2 (10th Cir. Feb. 27, 2001) (affirming denial of benefits to Vietnam veteran).

### Conclusion

IT IS THEREFORE ORDERED that Rivera's motion to reverse and remand [Doc. 12] is granted for the reasons stated herein and this matter is remanded for further administrative proceedings as explained above.

Lorenzo F. Garcia
Chief United States Magistrate Judge